**STATE OF OHIO, Plaintiff,**

v.

**CROFTERS, et al., Defendants.**

Civ. No. 72–138.

United States District Court,
S. D. Ohio, E. D.

Nov. 9, 1981.

Eugene F. McShane, Asst. Atty. Gen., Columbus, Ohio, for plaintiff.

Bruce G. Lynn, Jack Alton, James Ledman, Columbus, Ohio, for defendants.

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT OF ARTHUR ANDERSEN AND DUNN & BRADSTREET

CARL B. RUBIN, Chief Judge.

This case is currently before the Court on a Motion for Summary Judgment filed by defendant Arthur Andersen and joined in by defendant Dunn & Bradstreet.

### PERTINENT FACTS

In April of 1970, King Resources Company (hereinafter "KRC") executed a promissory note in which it promised to repay Plaintiff, the State of Ohio, $3,000,000 in two years at the rate of 9½%. The note was unsecured. In May of 1970 KRC executed another note in which it promised to pay Plaintiff $5,000,000 in two years at a rate of 9¾% with one point or $50,000 up front reduced from the overall amount of $5,000,000. This note was also unsecured. Interest was payable on both notes semi-annually and no equity positions were obtained in the company by Plaintiff.

Subsequently it was revealed that these notes were executed for money that was obtained illegally from Plaintiff and that the money was possibly being used by KRC's president, John King, to "take-over" another company. Eventually KRC was forced into bankruptcy and a reorganization proceeding under the bankruptcy laws began. At this point Plaintiff apparently had uncollectable promissory notes in the principal amount of approximately $8,000,000.

In its complaint, Plaintiff alleged that Defendants violated 15 U.S.C. § 77q(a) and (b) of the 1933 Securities Act; 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, 15 U.S.C. §§ 78*o*(a)(1), 15 U.S.C. § 78*o*(c)(1), 17 C.F.R. § 240.15(C)(1)–2, 15 U.S.C. § 78*o* (c)(2) of the 1934 Securities Act and Ohio laws.

Plaintiff claimed that Arthur Andersen prepared false and misleading financial statements which were included in KRC's annual reports. Plaintiff subsequently relied on these reports containing the false and misleading statements when it purchased the corporate notes in April and May of 1970.

Plaintiff also alleged that it relied on a letter from the National Credit Office, a division of Dunn & Bradstreet, which contained representations that KRC's notes were "prime", i. e. had the National Credit Office's highest rating for commercial paper. A prime rating was a statutory prerequisite to Plaintiff's ability to purchase the notes under Ohio Rev.Code § 135.14. Plaintiff alleged that Dunn & Bradstreet misled plaintiff because it improperly determined that KRC had a prime rating. Specifically, Plaintiff alleged that Dunn & Bradstreet's determination of KRC's capacity to issue and redeem short term notes was based solely on the Company's minimum net worth. Plaintiff alleged that the *proper* standard for making the determination of "prime" was whether or not the Company had "bank lines" sufficient to support the issue of commercial paper.

### ISSUES RAISED IN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A. *Jurisdictional*

1. Plaintiff Lacks Standing to Sue

■ Citing case law and the applicable statute to support their position, Defendants claim that Plaintiff, State of Ohio is not a person as defined under the 1934 Securities Exchange Act, 15 U.S.C. § 78c(a)(9), as it existed prior to the 1975 amendment, and therefore lacks standing to sue for violations of any provisions of that Act. Plaintiff contends that the cases Defendants cite are inapplicable because they involved situations where a state was being sued as a defendant. Furthermore, Plaintiff contends that the statutory language and legislative history do not unequivocally support a conclusion that a state may not sue as a plaintiff for violations of the Securities Exchange Act.

We have found no cases holding that a state government lacks standing to sue as a plaintiff for violations of the 1934 Securities Exchange Act. The cases cited by De-

fendants involved state governments being sued as defendants for violations of the anti-fraud provisions of the Securities Exchange Act. *See Woods v. Homes and Structures of Pittsburgh, Kansas, Inc.*, 489 F.Supp. 1270 (D.Kan.1980); *In re New York City Municipal Securities Litigation*, 507 F.Supp. 169 (S.D.N.Y.1980); *Greenspan v. Crosbie*, [1976–77 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 95,780 (S.D.N.Y.1976); *In re Equity Funding Corporation of America Securities Litigation*, 416 F.Supp. 161 (C.D. Cal.1976). These cases held that Congress intended to exclude governments from liability for *violations* of the 1934 Securities Exchange Act. However, none of these cases suggests that governments cannot seek the *protection* of the Act from fraud committed upon them in securities transactions.

Furthermore, the original version of the statute, the subsequent amendment of the statute specifically including the term "government" in the definition of person, and the legislative history concerning both versions of the statute do not necessarily support Defendants' argument.

Moreover, the very purpose behind the anti-fraud provisions of the 1934 Securities Exchange Act: "to eliminate serious abuses in a largely unregulated securities market", *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), requires that the word "person" in that statute as it existed prior to its amendment be interpreted so as to include a state government that is capable of bringing an action for fraud. *See, SEC v. National Securities, Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 571–72, 21 L.Ed.2d 668 (1969); *Union Planters National Bank v. CCBL*, 651 F.2d 1174 (6th Cir. 1981).

**2. The Promissory Notes Are Not Securities**

Defendants contend that this Court lacks subject matter jurisdiction for Plaintiff's securities fraud claims because the promissory notes executed by KRC are not securities within the meaning of § 10(b) of the 1934 Securities Exchange Act. 15 U.S.C. § 78j(b).

Title 15 U.S.C. § 78c(a)(10) defines security as:

(a) When used in this chapter, *unless the context otherwise requires* — . . .

(10) The term 'security' means *any note*, . . . but shall not include . . . any note . . . which has a maturity at the time of issuance of not exceeding nine months . . . ." *Id.* (Emphasis added)

Notwithstanding the "any note" language of the statute, not all notes executed in commercial transactions are protected by the anti-fraud provisions of the Securities Exchange Act[1]. *Union Planters National Bank, supra; Curran v. Merrill Lynch, Pierce, Fenner & Smith*, 622 F.2d 216, 222 (6th Cir. 1980), *cert. granted*, 451 U.S. 906, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981).

The definition of a security consists of a:

. . . flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek to use the money of others on the promise of profits. *SEC v. W. J. Howey Co.*, 328 U.S. 293 [, 66 S.Ct. 1100, 90 L.Ed. 1244] (1946).

Furthermore, form is disregarded in favor of substance, and application of the federal securities statutes depends on the economic realities underlying a transaction. *Union Planters National Bank v. CCBL, supra.*[2]

1. This is the "antiliteralist" approach to interpreting the statutory definitions in the Securities Acts. *Union Planters National Bank v. CCBL*, 651 F.2d ·1174, (6th Cir. 1981). It is designed to give meaning to the statutory language "unless the context otherwise requires." 15 U.S.C. § 78c(a)(10). In other words, a literal inclusion of a note within the language "any note" is not dispositive of the question of whether the note is a security for purposes of

the anti-fraud provisions of the Securities Exchange Act of 1934. *Union Planters National Bank v. CCBL*, supra. The "context" in which the note was issued must also be considered.

2. The Court in *Sanders v. John NuVeen & Co.*, 463 F.2d 1075 (7th Cir. 1972), *cert. denied* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1973), observed a distinction, important for purposes of this case, between notes that are not includ-

In the recent case of *Union Planters National Bank v. CCBL, supra,* the United States Court of Appeals for the Sixth Circuit set forth the four-part *Howey-Forman* test for defining a security. The test is designed to distinguish security transactions from commercial dealings. To meet the definition of a security, one must show that the transaction involved:

a. The presence of an investment;

b. In a common venture;

c. Premised on a reasonable expectation of profits;

d. To be derived from the entrepreneurial or managerial efforts of others.

Under each part of the test, the Sixth Circuit set forth subsidiary factors for consideration.

(a) *Presence of an Investment*

■ The "presence of an investment" requirement of the test looks at the economic realities of the situation by focusing on the nature and degree of risk involved in the transaction. This is known as the "risk capital" test. Although the nomenclature assigned to the transaction is relevant in determining whether or not a security is involved, the nomenclature is not dispositive. Instead, one looks to the following probative factors [3]: time, collateral, form of the obligation, circumstances of issuance, relationship between the amount borrowed and size of the borrower's business, and intended use of the funds.

*Time* is a probative factor because the longer an instrument is held the more likely it is a security. A short-term instrument is generally not a security unless payment is dependent upon success of a "risky" enterprise. Furthermore, notes with a maturity date of less than nine months are specifical-

ly exempted from coverage under the Securities Acts. *See,* 15 U.S.C. § 78c(a)(10).

*Collateral* is a probative factor because an unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in default of the payment.

The *form of the obligation* is a probative factor because it may help explain circumstances concerning the issuance of the obligation. This includes any type of restrictions placed on the use of the funds issued pursuant to the obligation. The greater the restrictions placed on the use of the funds and on the conduct of the borrower's financial operations by the form of the obligation, the more likely the transaction was a commercial loan.

*Circumstances of issuance* is a probative factor because obligations issued to a single party instead of a large class of investors is suggestive of the nature of the financing. If the obligation is issued to one party in an isolated transaction within a commercial circle, then the transaction is more in the nature of a loan agreement. On the other hand, if the obligation is issued to a large class of investors which are outside the normal commercial circles, then the transaction is more in the nature of an investment agreement.

The *relationship between the amount borrowed and the size of the borrower's business* is a probative factor because the larger the relative amount, the greater the risk of the lender. Such a risk is more indicative of an investment transaction. *See Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1258 (9th Cir. 1976).

*Intended use of the funds* is a probative factor because proceeds used primarily for

---

ed within the definition of a security and those that are.

> When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment. *Id.* at 1080.

**3.** These six factors are the criteria of the "risk capital" test, an analytical tool designed to isolate investment transactions covered by the Securities Acts, as opposed to those forms of commercial financing that Congress did not intend to be placed within the protection of the Acts. *Union Planters National Bank v. CCBL,* 651 F.2d 1174 (6th Cir. 1981).

capital formation are generally given pursuant to an investment transaction. Proceeds used to maintain current financial operations generally are not given pursuant to an investment arrangement. Funds spent on current operations generate a faster profit return for the investor than do funds used for capital expenditures. A quick profit return on an investment is more in the nature of a commercial loan transaction.

Factors that are given little weight are negotiability of the note and the motivation of the parties to enter the transaction. *Great Western Bank & Trust v. Kotz, supra* at 1258 n.5.

One must review these criteria in light of the purpose behind the Securities Acts: to eliminate serious abuses in a largely unregulated securities market. Furthermore, the applicability of a single criterion is not dispositive. However, it would appear that a majority of the criteria suggesting the existence or nonexistence of risk capital in a transaction would be determinative of whether or not there is "the presence of an investment".

■ Construing the evidence and pleadings in a manner most favorable to Plaintiff, *Smith v. Hudson*, 600 F.2d 60 (6th Cir. 1979), it appears that the transactions involved "risk capital" because the notes were not payable for two years, were not secured with collateral, placed no restrictions on the use of the loan proceeds or the financial operations of KRC, and reflected an amount borrowed that appeared to be relatively large in relation to KRC's business thereby indicating the taking of a substantial risk in the KRC enterprise. We are unable to determine the applicability of the other two criteria; circumstances of issuance and intended use of funds, because the record is insufficient. Nevertheless, there appears at this point in the case to be a presence of an investment in the transaction resulting in the issuance of two promissory notes from KRC.

### (b) *In a Common Venture*

The common venture requirement of the test focuses on the transactional relationships between the investor and promoter or lender and borrower. The relationships are classified as two types: those involving a vertical commonality and those involving a horizontal commonality. These classifications are based on the activities of the parties as they relate to the funds involved in the transaction.

A common enterprise involving vertical commonality is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties .... it requires only that the investor and promoter be involved in some common venture *without requiring* the involvement of other investors ....
A vertical relationship is best illustrated by a one-on-one arrangement between a lender and a customer. A horizontal common enterprise, on the other hand, requires a heightened level of affiliation. Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture....
In fact, a finding of horizontal commonality requires a sharing or pooling of funds. *Union Planters National Bank v. CCBL*, 651 F.2d 1174 (6th Cir. 1981).

■ For a common venture to exist, there must be horizontal commonality. *Id.*

■ Construing the evidence and pleadings of this case in a manner most favorable to Plaintiff, *Smith v. Hudson, supra*, it appears at this point that Plaintiff entered a transaction more characteristic of one involving horizontal commonality. There was no one-on-one arrangement in which Plaintiff's funds were exclusively interwoven with and dependent upon the efforts of KRC. Plaintiff and KRC were not exclusively involved in a *common venture*. Instead, Plaintiff's funds appear to have been used in the same fashion as the funds of other investors in KRC and any return of Plaintiff's funds and profits on Plaintiff's investment was dependent on the overall success of KRC.

### (c) Premised On A Reasonable Expectation of Profits

This requirement of the test recognizes that an "essential attribute" of an investment contract is the possibility that the value of the investment will appreciate. This is the profit one expects in return for his investment. In an investment transaction, profits are generally a function of the enterprise's managerial skills in business; therefore, the rate at which they are returned is variable or uncertain.

By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . . In such cases the investor is "attracted solely by the prospect of a return" on his investment. *United Housing Foundation v. Forman,* 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975).

Nevertheless, the Securities Acts regulate certain debt instruments which offer *fixed* rates of return. *El Khadem v. Equity Sec. Corp.,* 494 F.2d 1224, 1229 (9th Cir. 1974), *cert. denied* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974). For example, a corporate bond is a debt instrument that offers a fixed rate of return. However, it is included within the definition of a security. *Id.* With this type of investment, the lender's risk of loss varies with the borrowing company's management skills. *Id.; See, Union Planters National Bank, supra.*

■ Viewing the evidence and pleadings in this case in a manner favorable to Plaintiff, *Smith v. Hudson, supra,* it appears that the transactions in this case meet this part of the *Howey-Forman test.* The notes issued to Plaintiff were similar to corporate bonds in that expectation of profits was dependent upon the managerial skills of KRC. There was a sufficient "risk of investment" surrounding the transactions notwithstanding the fixed rate at which the profits were to be returned on the funds loaned.

### (d) To be Derived From the Efforts of Others

■ This part of the test requires that the profits expected from the investment transaction be derived from the "managerial or entrepreneurial efforts of others." As noted in the discussion on expectation of profits, Plaintiff's profits in this case were entirely dependent upon the managerial skills of KRC, even though they were to be returned at a fixed rate. Accordingly, it appears that Plaintiff's profits, as fixed by the notes of indebtedness, in these transactions were to be derived from the efforts of KRC's business management skills.

Therefore, at this stage of this case it appears that the transactions involved here meet the four part *Howey-Forman* test and that they are investment contracts within the definition of the term security as defined in the Securities Acts.

3. No Private Cause of Action is Cognizable Under 15 U.S.C. § 77q of the 1933 Securities Act.

■ Defendants also argue that this Court lacks subject matter jurisdiction over plaintiff's claim under 15 U.S.C. § 77q(a) and (b) of the 1933 Securities Act because no private action for damages is available under that section. The Sixth Circuit has not directly addressed this issue although in several cases it seems to have implied that there is a private cause of action. *See, Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194, 1196 (6th Cir. 1981); *Simmons v. Wolfsen,* 428 F.2d 455, 456 (6th Cir. 1970). The Supreme Court has expressly avoided ruling on this issue. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n.9, 99 S.Ct. 790, 795 n.9, 58 L.Ed.2d 808 (1979). However, there is a split of authority among the circuit courts that have addressed the issue with a majority of them favoring an implied private cause of action for damages. *Cf., Kirshner v. United States,* 603 F.2d 234 (2d Cir. 1978); *Daniel v. International Brotherhood of Teamsters, Chauffers, Etc.,* 561 F.2d 1223 (7th Cir. 1977); *Newman v. Prior,* 518 F.2d 97 (4th Cir. 1975) with *Shull*

*v. Dain, Kolman & Qual, Inc.*, 561 F.2d 152 (8th Cir. 1977); *Greater Iowa Corp. v. Mclendon*, 378 F.2d 783 (8th Cir. 1967). *See also Pharo v. Smith*, 621 F.2d 656, 673–74 (5th Cir. 1980).

For the reasons set forth in *Kirshner v. United States, supra,* at 241, we are inclined at this point in the case to follow the majority of circuit courts in finding that an implied private cause of action exists under 15 U.S.C. § 77q.

#### 4. Lack of Pendent Jurisdiction

Defendants' final jurisdictional argument claims that this Court lacks pendent jurisdiction over Plaintiff's state law claims. Because we have found that the Court has subject matter jurisdiction over Plaintiff's federal securities claims, we further find that our discretion in this matter would be best exercised by maintaining pendent jurisdiction over Plaintiff's state law claims.

### B. *Damages*

Defendants raise two arguments concerning damages.

#### 1. Prejudgment interests

■ Defendants argue that Ohio is not entitled to prejudgment interest on its claims. Defendants contend that to recover prejudgment interest, a claim must be liquidated and readily ascertainable by reference to an available standard. Plaintiff's claim was unliquidated until August, 1977 at which time Plaintiff sold its claim against defendants to Texas International. The sale involved the exchange of Plaintiff's rights in King Resources as established by the Bankruptcy reorganization proceeding. According to defendants, Plaintiff's claim against KRC then became zero. Thus, Defendants contend that there is no claim against them for any prejudgment interest because once the claim finally became liquidated, it was valued at zero.

There is a factual dispute concerning the value of Plaintiff's claim against defendants. Furthermore there is recent authority holding that in securities fraud actions, awards of prejudgment interest do not turn on characterizations of damages as being liquidated or unliquidated. Instead an award is a matter for a court's discretion exercised according to a standard of fairness. Under this standard, a court may in its discretion award prejudgment interest if compensation to a defrauded purchaser of a security is fair. *Sharp v. Coopers & Lybrand*, 491 F.Supp. 55 (E.D.Pa.1980). Accordingly, Defendants are not entitled to an entry of summary judgment on this issue.

#### 2. Actual Damages

■ Defendants claim that Plaintiff has already recovered $2,329,128.28 more than its actual damages and that under the Securities Act, Plaintiff may not recover more than its actual damages, which in this case is zero because actual damages have been recovered. Plaintiff contends that at the time of the alleged fraud in 1970–71 the notes were almost worthless, and that they were never redeemed. Instead of selling them at a loss, Plaintiff decided to keep them and reinvest them in the reorganization proceeding for reasons that were unrelated to the fraud. Subsequently, the notes increased in value and Plaintiff eventually sold them to another corporation, Texas International. Plaintiff argues that this wise and profitably successful choice in reinvesting the notes should not inure to the benefit of the Defendants. Plaintiff argues that it in effect made a second investment and that it may hold the securities for this second investment and still bring an action for fraud occurring in the first investment transaction. Plaintiff also argues that the Court should apply the "out-of-pocket" rule for calculating damages which requires that damages be computed at the time of actual purchase or at the time the fraud was disclosed. Plaintiff contends that by applying the "out-of-pocket" rule, damages computed at either the time the notes were purchased or at the time the alleged fraud was disclosed would amount to approximately $8,000,000.00 in damages.

There is a material factual dispute as to whether the KRC notes were ever redeemed. Thus, summary judgment on the

issue of actual damages would be improper at this stage of the case. Furthermore, there is support for Plaintiff's "second investment" theory as it relates to the question of damages. *See Nye v. Blythe, Eastman, Dillon, Inc.*, 588 F.2d 1189 (8th Cir. 1978); *Cant v. Becker*, 379 F.Supp. 972 (N.D.Ill.1974). Accordingly, Defendants' motion for summary judgment on this issue should be denied.

3. Punitive Damages

Defendants allege that punitive damages are not available in actions for federal securities laws violations and furthermore that Plaintiff has not alleged the actual malice necessary for recovery of punitive damages under state law claims of fraud.

Defendants are correct in their assertion that punitive damages are *not* recoverable under a violation of the Securities Exchange Act. However, punitive damages are available under pendent state law claims which are joined with counts brought under the Securities Exchange Act. *Gilbert v. Bagley*, 492 F.Supp. 714 (M.D.N.C.1980). Furthermore there is authority for the proposition that punitive damages are allowable for fraud where actual malice can be inferred from conduct and surrounding circumstances such as Defendants' recklessness or wanton, wilful and gross acts. *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975); *Davis v. Tunison*, 168 Ohio St. 471, 155 N.E.2d 904 (1959); *Saberton v. Greenwald*, 146 Ohio St. 414, 66 N.E.2d 224 (1946). Plaintiff's allegations of fraud meet this standard; therefore, a motion for summary judgment cannot be entered in favor of defendants on this issue.

IT IS HEREBY ORDERED that Defendants' motion for summary judgment be DENIED.